# EXHIBIT A

FILED
6/11/2025 6:21 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L007524
Calendar, U
33114471

FILED DATE: 6/11/2025 6:21 PM 2025L007524

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

**ILLINOIS GAMBLING RECOVERY, LLC.,**

Plaintiff,

v.

**KALSHI INC., KALSHIEX LLC, KALSHI KLEAR INC., KALSHI KLEAR LLC, KALSHI TRADING LLC, SUSQUEHANNA INTERNATIONAL GROUP, LLP, SUSQUEHANNA GOVERNMENT PRODUCTS, LLLP, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES, LLC, WEBULL CORPORATION**

Defendants.

Case No. **2025L007524**

Jury Trial Demanded

## COMPLAINT

Plaintiff Illinois Gambling Recovery LLC brings this action against Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, Kalshi Trading LLC, Susquehanna International Group LLP, Susquehanna Government Products, LLLP, Robinhood Markets, Inc., Robinhood Derivatives, LLC, and Webull Corporation (collectively, "Defendants") for recovery of gambling losses under the Loss Recovery Act, 720 ILCS 5/28-8. Plaintiff alleges as follows:

## INTRODUCTION

1. Illinois ("the State") comprehensively regulates gambling-related activities within its borders. To protect its residents from predatory and financially destructive gambling enterprises, it has prescribed exacting civil and criminal penalties on all those who would seek to sidestep that regulatory regime. For most, the threat of those penalties is deterrence enough. But

FILED DATE: 6/11/2025 6:21 PM    2025L007524

not for all. Lured by the tremendous wealth of the Illinois market, a group of companies has taken to offering illegal, unregulated gambling products to Illinois residents.

2.      Defendant Kalshi operates a "prediction market" accessible to the State's residents. That prediction market permits the buying and selling of products called "event contracts." While masquerading as novel securities offerings, these event contracts are in truth nothing more than illegal, unregulated wagers on the occurrence (or non-occurrence) of specific future events. Using this prediction market, the State's residents can place bets on (among other things) the outcome of sports games, on the winner of political elections, and on the song that will be the most popular this summer. These wagers do not differ materially—in form or function—from the offerings found in casinos, sportsbooks, and other traditional gambling establishments. Kalshi's prediction market violates both state and federal law. And because Defendants Robinhood and Webull have partnered with Kalshi to offer its prediction market on their own platforms, their platforms violate state and federal law too. Collectively, the State's residents regularly gamble (and lose) over $50 at a single time or sitting on each of these platforms.

3.      Prediction markets could not operate without the help of "market makers"— companies that provide liquidity by buying and selling event contracts. Kalshi's own Kalshi Trading LLC fills that role. So does Defendant Susquehanna. These market makers enable prediction markets' illegal, unregulated gambling offerings by providing much-needed liquidity. In exchange for the funds they provide, market makers receive various financial and non-financial kickbacks from Kalshi. In practice, these market makers employ precisely the same business model as the sportsbooks this State has extensively regulated. And they regularly profit at the expense of the State's residents, winning over $50 from them at a single time or sitting.

FILED DATE: 6/11/2025 6:21 PM  2025L007524

4.　　　　Recently, Defendants have come under sustained legal fire.  On April 1, 2025, the Illinois Gaming Board sent a cease-and-desist letter to Kalshi and Robinhood, finding "reason to believe" that they were "engaging in unlicensed sports wagering in violation of the Illinois Sports Wagering Act, 230 ILCS 45, and Illinois Criminal Code, 720 ILCS 5/28-1(a).  And that skepticism of Defendants' business model is widely shared.  In sending those cease-and-desist letters, Illinois joined at least six other States—Arizona, Maryland, Montana, Nevada, New Jersey, and Ohio. Legal commentators, sports executives, and lawful gambling companies have also publicly expressed the view that Defendants' product constitutes illegal, unregulated gambling.  And just last year, Kalshi itself admitted—in a filing before the D.C. Circuit—that the sports-betting event contracts it offers are something Congress meant to prohibit.  All this paints a grim future for Defendants' event-contract operations in the United States.

5.　　　　Like many States, Illinois offers an additional safeguard against illegal, unregulated gambling: its Loss Recovery Act.  Based on a 1710 British law passed during the reign of Queen Anne, that law makes certain gambling debts unenforceable.  It allows a losing party to sue the winning party for the value of losses exceeding $50 (and for fees).  And should the losing party fail to sue within six months, the statute authorizes anyone to bring a claim against the winning party for three times the amount of damages.

6.　　　　Defendants have operated in Illinois without regard to the State's legal limits for years.  They have taken tens of millions of dollars from Illinois gamblers.  But under the State's Loss Recovery Act, each time Defendants caused a gambler in Illinois to suffer gambling losses of at least $50, that person had the right to sue within six months to recover for his or her losses, plus costs.  And after six months, *any* person may sue for three times the amount of each gambler's unrecovered losses.  In filing this action, Plaintiff takes just that step.

3

FILED DATE: 6/11/2025 6:21 PM   2025L007524

## PARTIES

7.      Plaintiff Illinois Gambling Recovery LLC is a company formed under the laws of Delaware to enforce Illinois's gambling laws. Its mailing address is 1700 S MacDill Ave, Suite 300, Tampa, FL 33629. Plaintiff has no relationship to any gambler who has suffered gambling losses and has not colluded with any gamblers in bringing this action.

8.      Defendant Kalshi Inc. is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is the parent company of all other Kalshi entities (collectively "Kalshi"). Kalshi operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. On information and belief, the State's residents periodically lose over $50 at a single time or sitting to Kalshi.

9.      Defendant KalshiEX LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a commodities exchange. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. On information and belief, the State's residents periodically lose over $50 at a single time or sitting to Kalshi.

10.     Defendant Kalshi Klear Inc. is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a registered derivatives clearing organization. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. On information and belief, the State's residents periodically lose over $50 at a single time or sitting to Kalshi.

4

11.     Defendant Kalshi Klear LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a registered derivatives clearing organization. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. On information and belief, the State's residents periodically lose over $50 at a single time or sitting to Kalshi.

12.     Defendant Kalshi Trading LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a market maker for Kalshi's prediction market, buying and selling event contracts on the platform. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. On information and belief, the State's residents periodically lose over $50 at a single time or sitting to Kalshi.

13.     Defendant Susquehanna International Group LLP is a Delaware corporation headquartered at 401 City Avenue Suite 220, Bala Cynwyd, Pennsylvania 19004. On information and belief, it is the parent company of all Susquehanna entities (collectively, "Susquehanna"). As relevant, Susquehanna serves as a market maker for Kalshi, buying and selling event contracts on the platform. On information and belief, the State's residents periodically lose over $50 at a single time or sitting to Susquehanna.

14.     Defendant Susquehanna Government Products, LLLP is a foreign limited partnership incorporated in Delaware and headquartered at 80 State Street, Albany, New York 12207. On information and belief, it is a wholly owned subsidiary of Susquehanna International Group LLP and is one of several trading and investing entities within it. As relevant, Susquehanna

5

FILED DATE: 6/11/2025 6:21 PM   2025L007524

Government Products, LLLP operates as an institutional market maker for Kalshi, buying and selling event contracts on the platform. On information and belief, the State's residents periodically lose over $50 at a single time or sitting to Susquehanna.

15.     Defendant Robinhood Markets, Inc. is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. On information and belief, it is the parent company of all other Robinhood entities (collectively, "Robinhood"). Robinhood is an investment platform that permits trading on stocks, ETFs, and other commodities. As relevant, it has partnered with Kalshi to open—on the Robinhood investment platform—a prediction market hub, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. In concert with Kalshi, it helps operate a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

16.     Defendant Robinhood Derivatives LLC is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. On information and belief, it is the wholly owned subsidiary of Robinhood Markets, Inc. It is a futures commission merchant and provides options on futures trading. As relevant, it is the component of Robinhood that has partnered with Kalshi to offer a prediction market hub, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. In concert with Kalshi, it helps operate a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

17.     Defendant Webull Corporation ("Webull") is a Cayman Island corporation headquartered at 200 Carillon Parkway Street, St. Petersburg, Florida 33716. It is a financial services holding company that provides an electronic trading platform of the same name. As relevant, Webull has partnered with Kalshi to offer a prediction market hub, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. In concert with Kalshi,

FILED DATE: 6/11/2025 6:21 PM   2025L007524

it helps operate a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

18.     On information and belief, Defendants are each "winner[s]" at gaming within the meaning of the Loss Recovery Act, 720 ILCS 5/28-8.  On information and belief, each regularly causes Illinois residents to suffer gambling losses in excess of $50.

## JURISDICTION AND VENUE

19.     This case arises under 720 ILCS 5/28-8.

20.     This Court has jurisdiction over the subject matter of this case pursuant to Ill. Const. Art. VI, § 4.

21.     This Court has personal jurisdiction over the Defendants under 735 ILCS 5/2-209. Each of the Defendants transacts substantial business in the State, has purposefully directed its activities at residents of the State, and has purposefully availed itself of the benefits of the State's laws.  Plaintiff is a Delaware resident and its claims against Defendants arise out of, relate to, and have a substantial connection with business purposefully transacted by Defendants in Illinois.

22.     Venue is proper in Illinois because, among other things, the conduct underlying Plaintiff's claims occurred in Illinois.

## STATEMENT OF THE FACTS

### I.     ILLINOIS'S LOSS RECOVERY ACT ALLOWS PRIVATE PARTIES TO SUE FOR ILLEGAL GAMBLING

23.     While the specific conduct animating this lawsuit is recent, the cause of action animating it is not.  It traces its roots to the twilight of the House of Stuart, when Queen Anne adopted what would become known as the Statute of Anne of 1710.  That law had two main elements.  The first declared a wide range of gambling transactions void (in effect, freeing the losing party from any obligation to pay the winner).  The second created causes of action to claw

7

back gambling gains. Those who lost at least "the Sum or Value of ten Pounds" could sue the winner to recover the amount they lost, along "with Co[s]ts of Suit." And should the losing party fail to initiate that recovery suit within three months without just cause, any other person could bring a suit against the winning party for treble damages, with half going to the person suing "the other Moiety to the u[s]e of the Poor of the Pari[s]h." Resembling the modern *qui tam* action, this last provision deputized the public to serve as private Attorneys General. It also offered a financial incentive to induce them to investigate and pursue claims against gamblers.

24.     Illinois's own statute—informally referred to as its "Loss Prevention Act"—operates in much the same way. It provides that "[a]ny person who by gambling" loses "$50 or more" may bring "a civil action against the winner thereof, with costs, in the circuit court." 720 ILCS 5/28-8(a). And "[i]f within 6 months, such person . . . does not in fact pursue his remedy, *any person* may initiate a civil action against the winner." *Id.* 5/28-8(b) (emphasis added). Once that third party sues, "[t]he court or the jury" must "determine the amount of the loss," and "[a]fter such determination, the court shall enter a judgment of triple the amount so determined." *Id.*

25.     Illinois defines gambling broadly. *See id.* 5/28-1(a). Among other things, a party engages in unlawful gambling if it "knowingly owns or possesses any book, instrument or apparatus by means of which bets or wagers have been, or are, recorded or registered," if it "knowingly sells pools upon the result of any game or contest of skill or chance," or if it "knowingly transmits information as to wagers, betting odds, or changes in betting odds." *Id.* 5/28-1(a)(5), (6), (11). A party also engages in unlawful gambling if, subject to certain limited and enumerated exceptions, it "knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of

FILED DATE: 6/11/2025 6:21 PM    2025L007524

FILED DATE: 6/11/2025 6:21 PM    2025L007524

the Internet or to make a wager upon the result of any game, contest, political nomination, appointment, or election by means of the Internet." *Id.* 5/28-1(a)(12).

26.      Illinois exempts only certain enumerated activities from the definition of gambling. *See id.* 5/28-1(b). For example, it exempts the State Lottery, certain charitable raffle offerings, and certain antique slot machines. As relevant here, it also exempts "[s]ports wagering *when conducted in accordance with the Sports Wagering Act*." *Id.* 5/28-1(b)(15) (emphasis added). The Sports Wagering Act, signed by Governor Pritzker on June 28, 2019, permits certain individuals 21 years and older to engage in *regulated* sports betting at state-licensed brick-and-mortar facilities and on state-licensed digital platforms. 230 ILCS 45/25-1 et seq. It does not permit any other form of sports betting. Indeed, it expressly provides that "[n]o person may engage in any activity in connection with sports wagering in this State unless all necessary licenses have been obtained in accordance with this Act and the rules of the Board and the Department." *Id.* 45/25-20.

27.      Defendants in this case provide gambling offerings that fly in the face of those restrictions. In filing this action, Plaintiff sues to recover the ill-gotten gains obtained by Defendants from their unlawful event-contract operations.

## II.      PREDICTION MARKETS VIOLATE ILLINOIS LAW

28.      Unregulated sports betting is illegal in Illinois. But certain Defendants have disregarded that prohibition, operating "prediction markets" within the State. These markets enable the State's residents to purchase "event contracts"—illegal, unregulated wagers on future events. For example, Defendants allow the State's residents to wager on the outcome of an athletic competition, on the results of an election, and on whether a particular song will break into the Billboard Top 100. These wagers are indistinguishable from those offered in casinos, sportsbooks, and other gambling establishments. And because these prediction markets serve as counterparties

9

to each wager, shoulder the credit risk of their event contracts, and serve as their own market makers (facing off against the State's residents in the process), they are gambling "winners" for purposes of the State's Loss Recovery Act.

29.     These event contracts depend on the liquidity provided by institutional "market makers," which buy and sell event contracts. Market makers operate using a model indistinguishable from the sportsbooks that the State expressly prohibits. And when the State's residents purchase event contracts on a prediction market, they almost always face off against money provided by a market maker on the other side of the ledger. In that way, market makers make it possible for the State's residents to place illegal, unregulated gambles "against the house." Notably, the leading prediction market nationwide, Kalshi, also market-makes on its own platform using a wholly owned subsidiary, Kalshi Trading LLC. And because Defendants Robinhood and Webull host Kalshi's prediction market on their own platforms, they too function as prediction markets and are liable under the Loss Recovery Act.

30.     Because Defendants' offerings are illegal, unregulated gambling products and because Defendants are individually and collectively the "winners" of gambling competitions played by the State's residents, Plaintiff may sue for the uncollected losses Defendants have inflicted on those residents within the statute of limitations period.

## A. PREDICTION MARKETS ALLOW GAMBLING ON THE OCCURRENCE (OR NON-OCCURRENCE) OF FUTURE EVENTS

31.     This litigation centers on "prediction markets," which allow for the purchase and sale of "event contracts." Event contracts are defined federally as "agreements, contracts, transactions, or swaps in excluded commodities"—i.e., in commodities that do not have intrinsic cash value and that are not traded on a stock market—"that are based upon the occurrence, extent

FILED DATE: 6/11/2025 6:21 PM    2025L007524

of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i). Put more simply, event contracts are futures contracts that pay out if some non-commodity-related future event does (or does not) occur.

32.     Founded in 2018, Defendant Kalshi operates one of the largest prediction markets in the United States. Since July 2021, it has enabled individuals in all 50 States (including Illinois) to gamble on a wide range of future events spanning a wide range of subject matters. For instance, as of the time of filing Kalshi offers wagers on whether the Oklahoma City Thunder will win the NBA championship by a score of 4-2; on whether Gavin Newsom will be the Democratic nominee for President in 2028; on whether Bruno Mars will have the most Spotify listeners at the end of June; on whether New York City will receive more than 4 inches of rainfall this month, and on whether the Pope will say President Trump's name before the end of September.

33.     Kalshi's event contracts share a common form. For each, Kalshi poses a question about some definite future event. For example, Kalshi may ask: "Will the Kansas City Chiefs win the next Superbowl?" It then presents users with two options: "Yes" or "No." Users can buy either option at some variable price (set by market forces), ranging from $0.01 to $0.99. When the "Yes" and "No" options combined add up to exactly $1, an "event contract" is formed. Then, the parties wait for an answer to the question (in the example above, whether the Kansas City Chiefs will win the next Superbowl). If the Chiefs win, then Kalshi will pay the bettors who voted "Yes" the value of the $1 contract, while the bettors who betted "No" will lose the money wagered. If the Chiefs do not win, Kalshi will pay the bettors who voted "No" the value of the $1 contract, and the bettors who voted "Yes" will lose the money wagered.

34.     To make this model work, Kalshi permits trading (before a contract is finalized) of both "Yes" and "No" options. For example, if a user believes that the market is undervaluing the

11

Chief's chances of winning the Superbowl, that party is incentivized to purchase "Yes" contracts, driving the "Yes" price up and the "No" price down. Similarly, if a party believes that the market is undervaluing the Chief's chances of *losing* the Superbowl, that party is incentivized to buy "No" contracts, driving the "No" price up and the "Yes" price down. In that way, the final prices of both the "Yes" and "No" options should theoretically correspond to the percentage chance the market gives of each outcome occurring. So if, for example, "Yes" votes on the Chiefs were valued at $0.44 and "No" votes were valued at $0.56 (adding up to exactly $1), the predictions market would give the Chiefs a 44% chance of winning and other teams a 56% chance of winning.

35.     Kalshi profits off this arrangement directly, by charging what it styles as a "transaction fee." But that is a misnomer, because Kalshi is not merely overseeing transactions between parties. Rather, when "Yes" and "No" options add up to $1.00, Kalshi enters simultaneous wagers against *both* sets of buyers. When the outcome is decided, it is Kalshi that will ultimately pay the winners. And so Kalshi itself bears the credit risk. So, for example, if users fraudulently purchased "Yes" options, Kalshi that would be on the hook for paying the "No" holders anyway. Additionally, Kalshi does not necessarily match gamblers up 1:1, and (as noted in Kalshi Klear's Rulebook) it does not disclose the identities of the parties wagering on the other side of the ledger. In that way, Kalshi is not merely (or even mainly) an intermediary between other third-party bettors. Rather, it is, itself, part of "the house." And that point is only reinforced by the fact that Kalshi *also* acts as a market maker for its own platform, as discussed below.

36.     Indeed, Kalshi's business model closely resembles that of a traditional bookmaker. Ordinarily, bookmakers try to minimize risk by adjusting their betting lines to incentivize roughly equal investment on both sides of a wager. For example, if gamblers overwhelmingly bet in favor of the Kansas City Chiefs as a -400 favorite, sportsbooks could move the betting line on the Chiefs

12

FILED DATE: 6/11/2025 6:21 PM    2025L007524

FILED DATE: 6/11/2025 6:21 PM  2025L007524

to make them a -450 or -500 favorite instead. This would reduce the profitability of betting on the Chiefs, incentivizing more gamblers to come in on the other side of the ledger. By adjusting betting lines in this way, bookmakers can "balance their books." This ensures that they minimize losses, no matter who wins on the football field. And over time, it ensures they turn a profit. That is because the betting lines they offer for and against a team or player always preserve an edge for the house. Put differently, a gambler betting an equal amount of money for and against the same bet at a sportsbook will *always* lose expected value. Kalshi merely takes this business model and takes it one step further. Rather than derisking its operation by *roughly* balancing the money on both sides of the ledger, Kalshi derisks its operation by algorithmically *equalizing* them in its clearinghouse.

37.     The fact that Kalshi does a better job reducing risk than a traditional sportsbook does not change the fact that it—for all practical purposes—operates as one. Just like a traditional sportsbook, Kalshi offers bets both for and against various future outcomes. Just like a traditional sportsbook, Kalshi seeks to minimize risk by adjusting betting lines to track users' betting patterns. And just like a traditional sportsbook, Kalshi makes a profit by building into its calculus a small, statistical edge for itself. That it calls that edge a "transaction fee" is of no factual or legal significance. As the Maryland Lottery and Gaming Control Commission observed in its recent cease-and-desist letter to Kalshi: "The purchase of the [event] contract is indistinguishable from the act of placing a sports wager."

38.     While Kalshi is the most prominent prediction market operating in the State, other companies have entered the space. In 2024, Robinhood experimented with offering its own event contracts, allowing users nationwide (including, on information and belief, the State) to gamble on the result of the then-upcoming presidential election. And in May 2025, Robinhood partnered

13

FILED DATE: 6/11/2025 6:21 PM    2025L007524

with Kalshi to launch a "Prediction Markets Hub" within its app. This hub effectively allowed Robinhood users to buy and sell Kalshi event contracts without ever having to leave the Robinhood platform. Because Robinhood's event contracts are sourced by Kalshi, its Prediction Markets Hub is substantially identical to the prediction platform Kalshi offers on its own website. This platform is available to individuals in all 50 States, including in Illinois. Under the terms of its agreement with Kalshi, Robinhood shares in Kalshi's "transaction fee" each time an event contract is purchased on its platform. It is therefore a "winner" for all the same reasons and in all the same ways that Kalshi is a "winner." And it acts in concert and in privity with Kalshi to secure Kalshi's winnings at the expense of individual gamblers.

39.     Similarly, in February 2025, Webull partnered with Kalshi to launch an offering similar to Robinhood's Prediction Markets Hub. This offering allows Webull users to buy and sell Kalshi's event contracts using the Webull platform. Because those event contracts are sourced by Kalshi, the offerings are substantially identical to the ones Kalshi provides on its own website. This platform is available to individuals in all 50 States, including in Illinois. Under the terms of its agreement with Kalshi, Webull shares in Kalshi's "transaction fee" each time an event contract is purchased on its platform. It is therefore a "winner" for all the same reasons and in all the same ways that Kalshi is a "winner." And it acts in concert and in privity with Kalshi to secure Kalshi's winnings at the expense of individual gamblers.

40.     On information and belief, the State's residents have placed illegal, unregulated wagers (in the form of event contracts) on Kalshi's prediction market, both directly and through the prediction-market hubs offered by Robinhood and Webull, which are themselves powered by Kalshi). Many of those individuals have lost more than $50 at a single time or sitting and have

FILED DATE: 6/11/2025 6:21 PM   2025L007524

failed to sue within six months. Plaintiff may therefore sue to recover the money those Defendants have taken from the State's residents.

## B. MARKET MAKERS BOOKMAKE FOR PREDICTION MARKETS, PROVIDING VITAL LIQUIDITY

41.    For Kalshi to offer event contracts successfully, it needs sufficient liquidity. That is where "market makers" come in. Market makers help Kalshi set the probability of future events by buying event contracts they consider undervalued and by selling event contracts they consider overvalued. These opposing market forces drive event-contract prices to an equilibrium reflecting all publicly available information. In the process, they ensure there is enough price movement to set the "Yes" and "No" options for wagers exactly equal to $1.00—a requirement for forming a complete event contract. Indeed, Kalshi's own website admits that market makers play a key role in propping up its predictions market.

42.    To understand how market makers work, consider this example: Suppose you own a rare Ming Dynasty vase and want to know its value. But suppose there are few buyers in your immediate area with both the funds and the interest to bid on it. You could try to hold an auction to determine the vase's worth. But because of the relatively illiquid market, you would likely get less than fair market value. Instead, you could rely on the help of "market makers"—in this example, companies that regularly buy and sell similar antiquities. Because they compete against each other to acquire and offload inventory, they are incentivized to offer competitive rates to both buyers and sellers. As a result, you can use their pricing to approximate the true value of the vase.

43.    Market makers for event contracts work in much the same way. As repeat players, they provide liquidity to the event-contracts market, increasing its efficiency and promoting informationally efficient pricing. Sometimes, they can do so without taking on any financial risk.

15

FILED DATE: 6/11/2025 6:21 PM   2025L007524

For example, suppose (as often happens on Kalshi) that the "Yes" and "No" contracts on a specific wager add up to over $1.00. Specifically, suppose the "Yes" contract trades at $0.60 and the "No" contract trades at $0.42. If the same market maker acts as a counterparty to 233 "Yes" contracts and to 238 "No" contracts, it will profit no matter who wins the wager. This represents what a recent letter to the CFTC described as a "riskless principal transaction."

44.     To chase additional profits, market makers sometimes choose to favor one side of the ledger, providing liquidity to the market but taking on balance-sheet risk. Should the market maker wager incorrectly, it risks losing its money. To minimize this risk, market makers employ dedicated research teams, proprietary statistical models, and superior data and software. These allow them to estimate future events with greater accuracy than any individual gambler could hope to match. Additionally, market makers benefit from their unique contractual and technological integration with prediction markets, which provide them "financial benefits, reduced fees, differing position limits, and enhanced access." These perks greatly reduce market makers' financial exposure. As a result, wagering against individual gamblers is almost all upside for them.

45.     Between these two sorts of wagers, market makers extract essentially all the potential arbitrage available on Kalshi and other prediction markets. This makes it nearly impossible for individual gamblers to profit by gambling on Kalshi over time—even without factoring in Kalshi's so-called "transaction fee." And empirical studies bear this out. They show that, among those participate in sports betting, only about 3% profit each year. The other 97% loses money. And even that 3% is often the result of survivorship bias—the fact that, given enough time, someone must win eventually. Studies similarly suggest that individual gamblers have no more luck betting on other uncertain future events, such as music, pop culture, or world events.

16

And Kalshi admits as much point. For instance, its founder and CEO, Tarek Mansour, once boasted that "Kalshi is already the most accurate forecast for federal interest rates."

46.     In all relevant respects, the market makers here operate just like traditional sportsbooks. And that is unsurprising. Traditional sportsbooks are a *type* of market maker—one focused only on event contracts for sports-related events. Just like traditional sportsbooks, event-contract market makers can securing risk-free profits by arbitraging the "bid-ask spread"—that is, by capitalizing on the gap between buying prices and selling prices of certain wagers. Just like traditional sportsbooks, market makers are large institutional investors with large teams, sophisticated models, and extensive resources. Just like traditional sportsbooks, event-contract market makers enjoy privileged status as a result of their contractual and technological integration with the platform itself. And just like traditional sportsbooks, event-contract money makers will sometimes risk their own capital by committing it to one side of the ledger, putting them in direct competition with individual gamblers.

47.     It does not change matters that wagers on Kalshi usually offers percentages, rather than traditional betting lines. This is simply a matter of nomenclature. If, for example, the Kansas City Chiefs were -400 favorites to win a game at a traditional sportsbook, they would also be (assuming sufficient market liquidity) 80% favorites to win on prediction markets like Kalshi. Those two figures—being a -400 favorite and having an 80% chance to win—are different mathematical ways of expressing the same probability. And indeed, at least one leading sports-betting website encourages gamblers to convert sportsbooks' betting lines into probabilities (like the ones Kalshi uses) to assist them in calculating expected value.

48.     Data on Kalshi's website indicate that market makers account for the great majority of the total spending on Kalshi's event contracts. It follows that when the State's residents place

a wager on Kalshi, there is almost always a market maker on the other side of the leger. Thus, while Kalshi is in one sense the *direct* counterparty to every transaction on the platform (and therefore a "winner" of gamblers' money), market makers also function as a counterparty—regardless of whether they choose to assume balance-sheet risk. And because individual gamblers cannot match the knowledge, data analytics, and resources that market makers bring to bear, they lose expected value each time they purchase an event contract.

49. Prediction markets and market makers need not be separate entities. KalshiEX's rulebook acknowledges that Kalshi Trading LLC may be a member of the prediction market, meaning that it is able to place trades on individual wagers. And a recent article confirms that "Kalshi is also doing some of its own market making through a separate entity called Kalshi Trading." In other words, Kalshi does not merely own and operate a prediction platform. It *also* drives gambling on that platform by buying and selling its own inventory. In that way, Kalshi pits itself directly against individual users (including the State's residents). That is just one more respect in which Kalshi itself qualifies as a gambling "winner."

50. However, to provide added liquidity, Kalshi also partners with certain hand-selected third-party market makers. As Kalshi observes, its "market operates with the valuable support of a designated group of market makers," which "play a vital role in ensuring market fairness and orderliness." The most notable of these is Susquehanna, which in April 2024 became the first external institutional market maker on Kalshi. Despite being separate legal entities, market makers are not financially independent of Kalshi. Rather, they are its business partners. They contract directly with Kalshi to provide liquidity to its prediction market. In exchange, they receive all sorts of financial and non-financial kickbacks. In that way, all Defendants work in concert to make illegal, unregulated gambling available within the State.

18

FILED DATE: 6/11/2025 6:21 PM 2025L007524

51.     Kalshi's own website confirms this relationship with its market makers. It acknowledges that "applicants undergo a thorough review process evaluating their financial resources, relevant experience, and overall business reputation," and "[o]nly those demonstrating exceptional qualifications are granted market maker status." And it acknowledges that, as a reward for achieving that status, market makers receive benefits from Kalshi, "including but not limited to financial benefits, reduced fees, differing position limits, and enhanced access." The general public cannot access these benefits. And they provide market makers with a decided advantage when using Kalshi's platform, ensuring that they profit at the expense of the public.

52.     On information and belief, the State's residents have repeatedly placed illegal, unregulated wagers on event contracts directly supported by the liquidity provided by institutional market makers (including Kalshi Trading LLC and Susquehanna). Additionally, many of those residents have lost over $50 at a single time or sitting on wagers where market-makers' funds constituted the great majority of the funds on the opposite side of the ledger, and they have failed to sue within three months. Because the residents' funds flowed to these market makers, they are "winners" for purposes of the Loss Recovery Act. Plaintiff may therefore sue to recover the money they have taken from the State's residents.

## C. DEFENDANTS' CONDUCT IS ILLEGAL IN THE STATE

53.     Defendants' conduct is flatly illegal. Illinois criminalizes anyone who "knowingly owns or possesses any book, instrument or apparatus by means of which bets or wagers have been, or are, recorded or registered, or knowingly possesses any money which he has received in the course of a bet or wager," 720 ILCS 5/28-1(a)(5). Defendants also "knowingly sell[] pools upon the result of any game or contest of skill or chance," and "knowingly transmit[] information as to wagers, betting odds, or changes in betting odds." *Id.* 5/28-1(a)(6), (11). And Defendant

19

FILED DATE: 6/11/2025 6:21 PM   2025L007524

"knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet or to make a wager upon the result of any game, contest, political nomination, appointment, or election by means of the Internet." *Id.* 5/28-1(a)(12).

54.     Defendants do not fall within any statutory exception. Their sports-related event contracts clearly amount to sports wagering, as Illinois includes within that definition "accepting wagers on sports events or promotions of sports events, or on the individual performance statistics of athletes in a sports events or combination of sports events." 230 ILCS 45/25-10. But they are not *lawful* sports wagering, because they are not "conducted in accordance with the Sports Wagering Act." 720 ILCS 5/28-1(b)(15). Among other issues, Defendants are not licensed and regulated by the State as the Sports Wagering Act requires. 230 ILCS 45/25-10. Illinois law defines two "tiers" of sports betting: "Tier 1" includes all "sports wager[s] that [are] determined solely by the final score or final outcome of a sports event and [that are] placed before the sports event has begun." *Id.* "Tier 2" encompasses all other types of sports bets. *Id.* Both Tier 1 and Tier 2 wagers can only be placed on licensed sports betting platforms. ILCS 45/25-20(a). Illinois presently licenses ten such platforms, and Defendants are nowhere to be found on that list.

55.     Illinois has itself acknowledged the legal infirmity in many of Defendants' offerings. On April 1, 2025, the State sent cease-and-desist letters to Kalshi and Robinhood noting that it had "reason to believe" that both were "engaging in unlicensed sports wagering in violation of the Illinois Sports Wagering Act, 230 ILCS 45, and Illinois Criminal Code, 720 ILCS 5/28-1(a)." And Illinois was not alone in reaching that conclusion. It is one of seven States—along with Arizona, Maryland, Montana, Nevada, New Jersey, and Ohio—that have sent similar cease-and-desist letters objecting to Defendants' event-contract offerings.

FILED DATE: 6/11/2025 6:21 PM    2025L007524

56.     Defendants' offerings are also prohibited under federal law. The Wire Act imposes criminal penalties on any party that "engaged in the business of betting or wagering[,] knowingly uses a wire communication facility for the transmission in interstate or foreign commerce . . . of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers." 18 U.S.C. § 1084(a). And the Office of Legal Counsel has interpreted it to prohibit all gambling-related transmissions, including those unrelated to sports betting. *See* OLC, *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling* (Nov. 2, 2018). This interpretation postdated the Supreme Court decision that limited the Professional and Amateur Sports Protection Act of 1992 ("PASPA"), 28 U.S.C. § 3701 *et seq*. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).

57.     Defendants run afoul of the Wire Act by using a "wire communication facility"— here, the Internet—to send communications entitling the State's residents to "receive money" on the bets or wagers they place on Kalshi's platform. And all Defendants routinely send communications through the wires containing "information assisting in the placing of bets or wagers." That language covers both the prediction markets themselves and the market makers that—by purchasing the "Yes" and "No" options on Kalshi—communicate information about the relative likelihood of each of those outcomes. Moreover, given the contractual and technological ties between Kalshi, Robinhood, Webull, and Susquehanna, those companies necessarily communicate event-contract-specific information to one another regularly using digital means. All that is illegal under federal law, as prominent legal commentators have recently noted.

58.     Sports leagues have also expressed their concern. For example, Jonathan D. Nabavi, the National Football League's Vice President of Public Policy and Government Affairs, recently warned the CFTC that "[t]hese [event] contracts would mimic sports betting but

21

seemingly without the robust regulatory features that accompany regulated and legalized sports betting and which help to mitigate threats to the integrity of [the NFL's] contests." The National Basketball Association and Major League Baseball have publicly stated similar positions. Even other gambling companies have warned about Defendants' conduct. For example, Atlantic City's casino interests filed a brief observing that Kalshi is "presently violating the Wire Act."

59.     Perhaps most damning, Kalshi *itself* acknowledged the illegality of some of its present offerings just over a year ago in federal court. In a brief submitted to the D.C. Circuit, Kalshi argued that "Congress did not want sports betting conducted on derivatives markets." Brief for Appellee KalshiEX LLC at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024). It went on to acknowledge that such sports betting was "unlikely to serve *any* 'commercial or hedging interest.'" *Id.* at 45 (emphasis added). Yet Kalshi is now offering precisely what it concluded Congress wished not to permit. And Webull has similarly taken the view (despite partnering with Kalshi to offer event contracts on its platform) that sports event contracts are not lawful and should not be offered.

### D. DEFENDANTS CAUSE MASSIVE GAMBLING INJURY NATIONWIDE, INCLUDING TO THE STATE'S RESIDENTS

60.     Kalshi has exploded to become one of the largest gambling platforms in the United States. Within the first five months of offering sports contracts, per its own spokesperson, it traded "more than $1 billion" on "3.4 million sports propositions." Per that spokesperson, it has roughly two million users nationwide. And Kalshi prominently advertises—across its promotional materials—that it operates in all 50 States. On information and belief, many of those two million individuals reside within the State.

FILED DATE: 6/11/2025 6:21 PM   2025L007524

FILED DATE: 6/11/2025 6:21 PM  2025L007524

61.     Moreover, the individual bets placed on Kalshi are often significant.  For example, Kalshi's founder, Tarek Mansour, disclosed that during the presidential election, the median bet size in the United States for Kamala Harris was $85, and the median bet size for Donald Trump was $58.  Because over half of the bets placed nationwide exceeded both of those figures, and because the total amount wagered on the presidential election on Kalshi exceeded $85 million, the State's residents must have placed many bets of $50 or more on that wager alone.  And that is just one of many wagers Defendants have collectively featured.

62.     Robinhood's own event contracts offering, powered by Kalshi, features a similar scale.  Ever since unveiling its new prediction market hub in May 2025, experts have predicted the company's annual revenue to increase by around $260 million.  Early returns confirm that prediction.  When Robinhood offered event contracts for the most recent presidential election, it notched over 500 million contracts traded in one week alone.  Market analysts see Robinhood's move as an effort to tap into a gambling industry that they predict—without legal intervention— could swell to $95.5 billion in value by 2035.  Per its own internal records, Robinhood has over 11 million annual users scattered across the United States.  On information and belief, Robinhood's prediction market hub has widespread usage, including among the State's residents, and those individuals regularly gamble (and lose) over $50 on the platform at a single time or sitting.

63.     Webull's own prediction market hub, also powered by Kalshi, was unveiled in February 2025.  It operates much as Robinhood's does.  Webull boasts significant reach also, with over 23 million registered users worldwide and a revenue of over $117 million during the first quarter of 2025 alone.  Webull is available in all 50 States, including Illinois.  And on information and belief, Webull's prediction market hub has widespread usage, including among the State's

FILED DATE: 6/11/2025 6:21 PM 2025L007524

residents, and those individuals regularly gamble (and lose) over $50 on the platform at a single time or sitting.

64.      As noted above, Kalshi's event contracts (and the event contracts Robinhood and Webull offer through their partnerships with Kalshi) rely upon, and are propped up by, market makers. Kalshi's website notes that market makers trade on each of the company's covered products for some 98% of each 1-hour increment and "provid[e] constant liquidity." Because of their ubiquity, each time a resident of the State places a wager on Kalshi, it is overwhelmingly likely that there is a market maker somewhere on the other side of the ledger. And as the State's residents lose money in the long run gambling on Kalshi, these market makers will regularly win large sums of money—well exceeding $50—from those residents.

65.      Defendants' conduct is fueling a pandemic of gambling addiction. As one recent article noted, prediction markets like Kalshi and Robinhood "blur the already hazy line between betting and other financial activities," as "the ability to place one bet after another" on those platforms "encourages a hallmark behavior of problem gamblers—when deep in the red, instead of walking away, they bet bigger."

66.      Problem gambling is especially common among young sports bettors. Per one industry study, some 58% of 18- to 22-year-olds gamble on sports each year, with roughly 10% gambling on sports each week and 4% doing so daily. Sports gambling addictions can begin as early as age 10, and studies have found that between 4% and 8% suffer from problem gambling. Those addictions can prove financially ruinous. And the habit takes a severe emotional toll, too. Of problem gamblers who have sought out treatment, "between 22 and 81 percent . . . have been found to have suicidal ideations," and "between 7 and 30 percent of individuals have had suicide attempts."

24

FILED DATE: 6/11/2025 6:21 PM   2025L007524

## COUNT I
### (Claim under 720 ILCS 5/28-8)

67.      Plaintiff brings this count against all Defendants under the Loss Recovery Act, 720

ILCS 5/28-8.

68.      Upon information and belief, thousands of individuals within Illinois have lost—

and continue to lose—more than $50 gambling using Defendants' platforms and have not sued to

recover those losses within six months of payment to Defendants.  The identity and precise number

of such gamblers ("Gambling Victims") is within the unique possession of Defendants.

69.      Defendants are gambling "winner[s]" within the meaning of 720 ILCS 5/28-8(a).

70.      Plaintiff qualifies as a "person" authorized to sue for the recovery losses at gaming

within the meaning of 720 ILCS 5/28-8(b).  Plaintiff has not colluded with any Gambling Victims

in bringing this action.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendant and respectfully requests

that the Court grant the following relief:

A. Declaring that the Defendants are liable under the Loss Recovery Act, 720 ILCS
   5/28-8;

B. Awarding eligible damages, continuing until the time of final judgment, based on three
   times the value of the money lost to Defendants at gambling;

C. Awarding the costs of prosecuting this action, including reasonable attorney's fees,
   experts' fees, and litigation costs together with interest;

D. Awarding pre- and post-judgment interest as allowed by law; and

25

E.  Granting such other relief as the Court deems proper.

Dated: June 11, 2025

Respectfully submitted,

*/s/ Timothy E. Grochocinski*

Timothy E. Grochocinski
Illinois Bar No. 6295055
tim@nelbum.com
Charles Austin Ginnings
Illinois Bar No. 6343678
austin@nelbum.com
Taryn N. Trusty
Illinois Bar No. 6344409
taryn@nelbum.com
NELSON BUMGARDNER CONROY PC
745 McClintock Drive, Suite 340
Burr Ridge, Illinois 60527
708.675.1974 (telephone)

Derek T. Ho (Pro Hac Vice, forthcoming)
Kyle B. Grigel (Pro Hac Vice, forthcoming)
KELLOGF, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C
1615 M. Street, N. W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
kgrigel@kellogghansen.com

*Counsel for Plaintiff*

FILED DATE: 6/11/2025 6:21 PM   2025L007524

26